ams

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-40034-JAR** |
| | ) | |
| **TERRY W. CARR,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on defendant Terry W. Carr's Motion to Suppress

Evidence Due to Misrepresentations in Search Warrant Affidavit (Doc. 17), and Appeal of

Detention Order (Doc. 16). The Court held a hearing on these matters on July 17, 2007. After

reviewing the evidence presented to this Court at the July 17 hearing, the transcript from the

detention hearing and Judge Sebelius's Detention Order, the Court is now prepared to rule. For

the reasons stated below, both defendant's motion to suppress and his appeal are denied.

**I.  Motion to Suppress**

   *A.  Background*

On December 13, 2006, Judge Richard Rogers approved a search warrant for multiple

residences that were the subject of a large-scale narcotics investigation, including defendant

Terry Carr's residence. The eighty-eight page affidavit[1] in support of the search warrant was

executed by Officer Douglas D. Garman, a Narcotics Investigator in the Criminal Investigation

Division assigned to the Drug Enforcement Administration ("DEA") Task Force in Topeka,

---

[1](Ex. A.)

Kansas.  Officer Garman has worked for the Topeka Police Department since 1999 and has extensive experience in investigating drug trafficking activity.  Officer Garman has worked in an undercover capacity, purchasing user amounts as well as large quantities of controlled substances such as methamphetamine, cocaine, and marijuana.  He estimates that he has taken part in over 400 undercover purchases.  Officer Garman testified that those involved in the distribution and use of drugs often communicate in ways that outsiders do not understand.  Further, Officer Garman testified that he has performed extensive investigative work with confidential informants (CIs) and that they have informed him that drug transactions are often conducted through the use of coded language.

The affidavit recounts the investigation of an alleged cocaine distribution conspiracy involving a number of individuals.  The investigation included many controlled purchases by a CI from Michael Jordan, a defendant in a related case.  Also, investigators obtained a wiretap of two cell phones belonging to Michael Jordan.  Officer Garman testified that he reviewed all of the nearly 16,000 phone calls recorded on Phone #1 and about 208 phone calls on Phone #2.  According to Officer Garman, a certain code of communication developed between Jordan and his alleged co-conspirators that investigators were able to understand based on the information obtained from the CI and recognized patterns that developed over the two month period of time that they intercepted the phone calls.

The portion of the affidavit that relates to Carr's residence recounts four intercepted conversations between Carr and Jordan.  While Officer Garman did not include in the affidavit the transcript of the interceptions, he interprets the otherwise innocuous language based on what the context of each call entailed.

### B.  Analysis

Carr now alleges that Officer Garman's interpretation of these phone calls was either intentionally false, or made with reckless disregard for the truth, so that under *Franks v. Delaware*,[2] the fruits of the search should be suppressed.  Carr points to the transcripts from each of the four calls that involve him and compares them to the interpretation provided by Officer Garman in his affidavit.  The government responds that Officer Garman was qualified to interpret the conversations in light of the thousands of other calls he had reviewed involving Jordan and the information he obtained from informants.  The government argues that these other calls, as well as the information provided by the CI, provided the investigators with a broader context within which to interpret the calls between Jordan and Carr.

*Franks* allows a defendant to request an evidentiary hearing regarding the veracity of the search warrant affidavit.[3]

> Before being entitled to such a hearing, the defendant must allege deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . If the allegations are met, then the defendant must show that the remaining content of the warrant affidavit is insufficient to support a finding of probable cause.  "The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods."[4]

At the July 17 hearing, the Court found that defendant met his burden to entitle him to an evidentiary hearing on the veracity of the affidavit.

After considering the evidence presented at the *Franks* hearing, if the district court concludes by a preponderance of the evidence that the affidavit contains "intentional or reckless

---

[2]438 U.S. 154 (1978).

[3]*See, e.g.*, *United States v. Artez*, 389 F.3d 1106, 1116 (10th Cir. 2004) (citing *Franks*, 438 U.S. at 171).

[4]*Id.* (quoting *United States v. Avery*, 295 F.3d 1158, 1166 (10th Cir. 2002)).

false statements," or "material omissions," "'then the district court must suppress the evidence obtained pursuant to the warrant.'  If, however, the district court concludes that the omitted information would not have altered the magistrate judge's decision to authorize the search, the fruits of the challenged search need not be suppressed."[5]

Carr attempts to show that the statements made in the affidavit by Officer Garman were either intentionally false or made with reckless disregard for the truth by comparing Officer Garman's interpretations of the conversations between Carr and Jordan to the transcripts of each call.  According to Carr, there is no context to support Officer Garman's interpretations of the conversations set forth in paragraphs 91, 92, or 95.

First, Carr objects to the statement in paragraph 91, concerning an October 24, 2006 phone call at 3:23 p.m. between Carr and Jordan:

> Carr and Jordan discussed clothing that both Carr and Jordan were selling.  As the conversation continued Jordan asked Carr what was going on, "Same ole, same ole?"  Carr replied yep "same ole, same ole, yeah I need to holler at you."  The context of the conversation indicates that Carr wants to obtain cocaine from Jordan.  The comment "same ole" indicates that Jordan and Carr have conducted cocaine transactions in the past and Carr wanted to obtain the same amount of cocaine that Carr had received from Jordan in the past.

Carr argues that the transcript does not support Officer Garman's interpretation of this conversation.  The actual statement made by Carr continues, "Yeah I need to holler at you nigga I got a plug on some shoes, on those Jordans. . . ."[6]  Given that "same ole" is a common greeting and that the parties were talking about selling Nike Jordans, Carr argues that there are many

---

[5]*Avery*, 295 F.3d at 1166–67 (quoting *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000)).

[6](Ex. B.)

4

reasonable interpretations and Officer Garman's is mere speculation.  Carr urges that a more reasonable interpretation is that the call was about selling shoes, rather than drugs.

Next, Carr challenges the statement in paragraph 92, describing a later October 24, 2006 phone call at 4:53 p.m. between Carr and Jordan:

> Jordan told Carr that Jordan had forgot about Carr because a friend had came [sic] over and that Jordan was on his way.  The context of the conversation indicates that Carr had been waiting for Jordan to deliver cocaine to Carr and that Carr had called Jordan to see what was taking so long.

Carr argues that no reasonable person could interpret the conversation as Officer Garman did given that the actual transcript of the conversation indicates that Jordan said to Carr: "Oh man I forgot about you man, my fault, friend of mine came over, I'm on my way right now."  Carr replied, "Oh man," and Jordan then said "Huh?  Your phone cut out . . . . hello?"[7]  The call then ended.

Finally, Carr complains that the interpretation provided in paragraph 95, of a November 17, 2006 phone conversation at 5:15 p.m. between Carr and Jordan is inaccurate:

> Jordan asked Carr if Carr had ever handled that and Carr said that Carr had. Jordan indicated that Jordan was just checking and went on to tell Carr that Jordan had put that little puzzle together. Carr indicated that Carr understood what Jordan had said.  The context of the conversation indicates that Jordan asked Carr if Carr had obtained the cocaine that Carr was trying to obtain in the past. Carr confirmed that Carr had obtained cocaine from a [sic] alternate source other then Jordan. Jordan told Carr that Jordan had obtained additional cocaine from Jordan's source and Carr indicated that Carr would contact Jordan when Carr needed additional cocaine.

Carr argues that the context of the conversation does not lead to the conclusion made by

---

[7](Ex. C.)

Officer Garman.  The transcript shows that Jordan asked Carr if he ever "handled that."  And then Jordan told Carr that he "went on and put that puzzle together my damn self man."[8]  The rest of the conversation is about Carr being hungover from the night before.  Carr maintains that "putting the puzzle together" and the question of whether Carr had "handled that," are common phrases and that there is no context upon which to base Officer Garman's conclusion that these comments referred to drugs.

The Court declines to address Carr's challenges on a "line-by-line" basis, as the context of the entire affidavit is highly relevant in understanding the intercepted conversations at issue. In determining whether the search warrant affidavit was sufficient to support probable cause, the Court must look at the "'totality of the circumstances and [] ensur[e] "that the magistrate had a substantial basis for concluding that probable cause existed."'"[9]  In this case, the Court must look at the totality of the circumstances, as set forth in the affidavit, and determine whether Judge Rogers had a substantial basis for drawing a reasonable inference that a search of Carr's residence would uncover evidence of a drug distribution conspiracy, or drug distribution.  In contrast to Carr's contention, the key inquiry is not whether each isolated conversation provided context for the investigator's interpretation, but whether the facts learned during the course of the entire investigation and relayed in the lengthy affidavit support Officer Garman's characterization of the conversations at issue such that Judge Rogers could find a substantial basis for probable cause.  The Court finds that under this totality of the circumstances standard, defendant is unable to come forward with evidence of intentional or reckless disregard of the

---

[8](Ex. 95.)

[9]*United States v. Harris*, 369 F.3d 1157, 1164 (10th Cir. 2004) (quoting *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983))).

truth as to any statement or omission made in the affidavit.

First, cryptic or coded conversations can support a finding of probable cause.[10]  The evidence presented in the affidavit and at the hearing establishes that Officer Garman was qualified to interpret the conversations summarized in paragraphs 91 through 95 of the affidavit. Officer Garman has a wealth of experience investigating drug crimes both as an investigator and as an undercover officer.  In his capacity as an undercover officer, he has been involved in hundreds of purchases of narcotics and regularly was in contact with drug users and distributers. During the course of this investigation, Officer Garman reviewed thousands of phone calls on two cell phones used by Michael Jordan to communicate with alleged co-conspirators.  He also communicated regularly with CIs during the course of the investigation who were familiar with the language and routine employed by Jordan and his co-conspirators.

Second, there is no evidence that Officer Garman deliberately misrepresented or omitted facts in the affidavit, or that he did so with reckless disregard for the truth.  The conversations cannot be viewed in a vacuum.  As Officer Garman testified, by the time investigators intercepted the conversations between Carr and Jordan on October 24, 2006, they had intercepted 6000 to 7000 calls involving Jordan.  The conversations with Carr were similar to many of these other conversations, in that they used general terms and never spoke about an exact amount or price.  Officer Garman stated that there were numerous calls asking where Jordan was or asking what was taking so long.

In particular, the probable cause established by the October 24, 2006 conversations were

---

[10]*United States v. Smith*, 118 F. Supp. 2d 1125, 1132–37 (D. Colo. 2000); *United States v. Shakur*, 560 F. Supp. 318, 334–35 (S.D.N.Y. 1983), *aff'd sub. nom. United States v. Ferguson*, 758 F.2d 843 (2d Cir. 1985), *cert. denied*, 474 U.S. 841, 1032 (1985).

based on the series of calls, accompanied by surveillance.  The first call took place at 3:23 p.m.,
where Jordan asked Carr, "whats going on same ole same ole?"  Carr replied, "Yeah same ole,
same ole Yeah I need to holler at you nigga I got a plug on some shoes, on those Jordans."[11]
Officer Garman testified that there was a break in the conversation after Carr said he need to
"holler at" Jordan.  According to Officer Garman, up to that point, Jordan was asking whether
Carr wanted some cocaine, and Carr replied that he did.  Then, the conversations turned to shoes,
as the rest of the transcript shows.  This conversation was followed up by the one at 4:53 p.m.,
where Carr called Jordan and asked where he was and Jordan told him he had forgotten about
him.  That conversation was followed up with another call where Jordan told Carr that he was
having car trouble but that he was on his way.  Carr responded for him to hurry up.  The affidavit
states that members of a team conducting surveillance on Jordan, observed Jordan on October 24
travel from his residence to Carr's.

        The entire picture that these facts paint constitutes the probable cause, not each
conversation in isolation.  It was reasonable, based on the context of this series of
communications, along with other facts included in the affidavit, for Officer Garman to interpret
the conversations at issue in the way he did.  There is no evidence here to suggest that he
deliberately misrepresented or omitted facts.

        Moreover, when the affidavit is read in its entirety, as it must be, the language used
during the intercepted conversations between Carr and Jordan is reasonably interpreted as
Officer Garman represented in the affidavit.  One example is the use of "it" and "that" to
describe cocaine or payment for cocaine, which appears in a number of other places in the

-------------------------

[11](Ex. B. )

8

affidavit.[12]  Other examples in the affidavit of language used in the Carr conversations include,

asking "what is going on" as code for cocaine on the phone,[13] references to the puzzle,[14]

references to "hit" as providing with cocaine,[15] and references to not "forgetting about" someone

who Jordan was going to make a cocaine deal with.[16]

   For all of these reasons, defendant fails to show by a preponderance of the evidence that

Officer Garman made deliberately or recklessly false statements or omissions in the search

warrant affidavit.  He accurately stated that he was summarizing and interpreting the

conversations based on their context, which he was certainly qualified to do.  In other words,

Judge Rogers was given the information he needed to determine if probable cause existed and

---

  [12]*See* Ex. A. at 21 (Jordan says "Yeah, I gotta go and grab it, and shit," in a call to CS-1, indicating that he had to go to another location to pick up the cocaine)' 26 (Jordan tells CS-1 "I'm going to go grab it and then I'll be over at the school."  CS-1 told investigators that this meant Jordan was going to go to another location to pick up the cocaine and then meet CS-1 back at Bernice Stewart's residence, which was across the street from Highland Park High School) 27 (Jordan asks if CS-1 was still "trying to do that", which CS-1 says means whether he wanted to buy 2 1/4 ounces of cocaine, Jordan then said he had to go "break it down"); 54 (when Jordan asked Curtis Eatmon where he was, Eatmon told him that he was "running home to get it."); 56 ("So what does it look like man?", meaning how much cocaine was left to sell and how much money Eatmon had); 73 (Jordan tells Stewart to "go over there and grab that for me." referring to the place where she was to meet Lepoleon Redmond and pick up money Redmond owed Jordan).

  [13]*See id.* at 53 ("During the conversation Jordan asked Eatmon what was going on.")

  [14]*See id.* at 54 (During a conversation between Jordan and Eatmon, Jordan told him that Jordan had "gotten that puzzle put together and that Jordan wanted to get with Eatmon."); 84 (Jordan tells Carl Cameron that Jordan was "trying to put a puzzle together.").  In addition to these conversations, the puzzle reference on page 54 gains even more context when viewed with the fact that after this "puzzle" conversation, Jordan told Eatmon that three highway patrolmen followed Jordan when he went to buy the cocaine in the Kansas City area.  That conversation occurred on the same day, November 17, as the intercepted phone call between Carr and Jordan where Jordan says that he put the puzzle together himself.  Moreover, Officer Garman testified that there were many calls that had been intercepted that referred to a puzzle, including calls involving Joaquin Torres, Jordan's supplier.  Together with surveillance, investigators were able to piece together that "putting the puzzle together" meant Jordan obtaining money from his dealers, talking to his source, going to Missouri and then when he returns, calling his dealers to say he has it.

  [15]*See id.* at 54 (to Eatmon: "I hit you right up."); 71 (Jordan tells Redmond he is waiting on him and Redmond replies, "let me see what I've got counted up and I'll hit you in a minute."); 74 ("Redmond told Jordan the he would be hitting him later.")

  [16]*See id.* at 68 ("Jordan told Redmond that Jordan had not forgotten about Redmond").

was easily able to determine a substantial basis for believing there to be probable cause as represented in the affidavit.  Accordingly, Carr's motion to suppress is denied.

## II.  Appeal of Detention Order

Defendant was charged in a five-count Indictment on April 18, 2007 with: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine; (2) knowing and intentional use of a communication facility to commit the conspiracy; (3) knowing and intentional use of a communication facility to commit the conspiracy; (4) possession with intent to distribute cocaine; and (5) possession of a firearm in furtherance of a drug trafficking crime (Doc. 1).

On May 11, 2007, Magistrate Judge Sebelius ordered Carr be detained, after conducting a hearing.  Judge Sebelius found by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person in the community.  He also found that defendant had failed to rebut the following statutory rebuttable presumptions in favor of detention: (1) there is probable cause to believe that defendant committed an offense for which a maximum term of imprisonment of ten years or more is prescribed under the Controlled Substances Act, 21 U.S.C. § 801 *et. seq.*; (2) there is probable cause to believe that defendant committed an offense under 18 U.S.C. § 924(c); and (3) the crime charged is a crime of violence.

Under 18 U.S.C. § 3145(b), a person, who has been ordered detained by a magistrate judge, may file a motion for revocation or amendment of that order.  The statute requires the court to determine the motion promptly.  This Court's review of the magistrate judge's detention

or release order is *de novo*.[17]  A district court must "make its own determination if pretrial detention is proper or set conditions of release" and "ultimately decide the propriety of detention without deference to the magistrate judge's conclusion."[18]

Under the Bail Reform Act of 1984, there is a rebuttable presumption of risk of flight or danger to the community that applies when a defendant has been charged with certain crimes. "'A grand jury indictment provides the probable cause required by the statute to trigger the presumption.'"[19]  If one of the statutory conditions for the rebuttable presumption of risk and flight exists, the defendant has an initial burden of production to offer some credible evidence to the contrary.[20]  The government retains the overall burden of proof, though, to show that there is no condition or combination of conditions that would reasonably assure the safety of other persons in the community.[21]

When determining whether the statutory presumption in favor of detention has been rebutted, the Court is to look to the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including–

---

[17]*United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003); *Gee v. Estes*, 829 F.2d 1005, 1008 (10th Cir. 1987).

[18]*United States v. McNeal*, 960 F. Supp. 245, 246 (D. Kan. 1997) (citing *United States v. Carlos*, 777 F. Supp. 858, 859 (D. Kan. 1991); *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990); *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987)).

[19]*United States v. Walters*, 89 F. Supp. 2d 1217, 1220 (D. Kan. 2000) (quoting *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir. 1990)).

[20]*See United States v. Walters*, 89 F. Supp. 2d 1217, 1220 (D. Kan. 2000).

[21]*United States v. Lutz*, 207 F. Supp. 2d 1247, 1251 (D. Kan. 2002).

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.[22]

Here, three statutory presumptions in favor of detention apply to Carr. Carr argues that he can rebut the presumption because (1) he does not pose a flight risk, and (2) the criminal history set out in the search warrant affidavit is overstated. Moreover, he argues that, for the same reasons set out in the motion to suppress, the government is unable to show probable cause for most of the charges filed against him. As an initial matter, the Court has already determined in this Memorandum and Order that the search warrant affidavit sufficiently set forth probable cause to search Carr's residence, based on the allegations that he was involved in a drug distribution conspiracy. This alone negates most of Carr's arguments in favor of pretrial release.

### A. Flight Risk

Carr argues that his family all resides in Topeka and that he has never failed to appear in court. Further, the heavy penalty associated with the conspiracy charge in this case does not

---

[22]18 U.S.C. § 3142(g).

suffice as a motive to flee because of the probable cause arguments made in the suppression motion.  Carr argues that it is more likely that he would be found guilty of possession of a personal use amount of cocaine.  Under such a conviction, he would only have a guidelines range of 12-18 months.  Carr also contends that the government will have difficulty proving the firearm and possession with intent charges.  The Court agrees with Judge Sebelius that the concern with this defendant is not risk of flight.  As Judge Sebelius pointed out at the detention hearing, the real issue for the Court to address is risk to persons in the community.

### B.  Risk to Persons in the Community

Under the nature and circumstances of the offense and weight of evidence factors, Carr argues that the conspiracy charge is extremely weak.  He maintains that the decision to detain him was made based on his criminal history, which does not show by clear and convincing evidence that he poses a threat to anyone or the community.  Carr then goes through his criminal history and points out that there are only four misdemeanor offense convictions and one conviction for Driving While a Habitual Offender, which is no longer a felony offense.  The rest were arrests and charges that were never finally adjudicated.

Again, the Court has denied Carr's motion to suppress based on his argument that the conspiracy charge is weak, under a *Franks* challenge analysis.  And even without the conspiracy charge, the drugs and gun found at his residence trigger other bases for the rebuttable presumption in favor of detention to apply.  Further, the Court is not persuaded that Carr's criminal history militates in favor of release, even if it would only amount to a lower criminal history score.  The crux of this appeal depends upon Carr's success on the motion to suppress.  For substantially the same reasons set forth in its discussion of that motion, the Court denies Carr's appeal of his detention order.

13

**IT IS ORDERED BY THE COURT** that defendant's Motion to Suppress Evidence Due to Misrepresentations in Search Warrant Affidavit (Doc. 17), and Appeal of Detention Order (Doc. 16) are **denied**.

Dated this 31st day of July 2007.

S/ Julie A. Robinson
Julie A. Robinson
United States District Judge

14